## AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR A SEARCH WARRANT

I, Kyle Applegarth, being duly sworn, hereby deposes and states the following:

## INTRODUCTION AND AGENT BACKGROUND

1.     I am a Senior Special Agent with the Kansas Bureau of Investigation ("KBI") and have been so employed since January 2020. I also serve as a Task Force Officer with the United States Secret Service ("USSS") and have done so since January 2025.

   a.  I am currently assigned to the KBI Cyber Crimes Unit and am responsible for investigating technology-facilitated crimes, including but not limited to, crimes involving Child Sexual Abuse Material, production, distribution, and exploitation. I investigate violations of both state and federal criminal laws, including offenses pertaining to the illegal production, distribution, receipt, and possession of child pornography (in violation of 18 U.S.C. §§ 2251, 2252, and 2252A).

   b.  As part of my duties, I have conducted many child exploitation investigations; to include the possession, distribution, receipt, and/or production of child pornography, the transportation of child pornography, and the coercion/enticement of minors. I have also assisted law enforcement partners with their investigations involving the sexual exploitation and sexual assault of minors.

   c.  As such, I have become familiar with ways that child pornography is shared, distributed, and/or produced, including the use of various social media websites and messaging applications (Google, Kik, Instagram, Facebook, Snapchat, Discord, Telegram, WhatsApp, etc.) and cloud-based storage services (Dropbox, iCloud, MegaNZ, Synchronoss, etc.).

   d.  As part of these investigations, I have drafted and executed search warrants on residential properties, vehicles, electronic devices, and electronic service providers. I have also conducted interviews of persons who possess, distribute, and/or produce child pornography. I have received training on handling electronic evidence, manually searching electronic evidence, and conducting forensic extractions.

   e.  Prior to my service as a USSS TFO, I filled the role of TFO with the Federal Bureau of Investigation's Cyber Crime Task Force in Kansas City. In such capacity I had the opportunity to investigate multiple federal crimes of a cyber/technical nature.

   f.  Over the course of my law enforcement career I have received training from a broad technical base. Such training includes but is not limited to CompTIA Security+, GIAC Battlefield Forensics and Acquisitions, the National Technical Investigators Association, as well as trainings through Carnegie-Mellon University, the Federal Bureau of Investigation, and the National White Collar Crime Center.

## PURPOSE OF THE AFFIDAVIT

2.      This Affidavit is submitted in support of an application under Rule 41 of the Federal Rules of Criminal Procedure in support of a search warrant for a **Samsung Galaxy S21 FE 5g cellular telephone and the extraction from that phone, (referenced herein as TARGET DEVICE)** specifically described in Attachment A of this Affidavit, seized from **RYAN ANDREW BRUNGARDT ("BRUNGARDT")** on or about January 29, 2024, and currently in the possession of the Newton Police Department located at 120 E 7th ST, Newton, Kansas.

3.      The statements in this Affidavit are based on police reports, statements and information provided by other law enforcement officers involved in this investigation, and from my own observations made during the investigation. Since this Affidavit is being submitted for the limited purpose of securing a search warrant, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that they believe are necessary to establish probable cause to believe that contraband and evidence, fruits, and instrumentalities of the federal violations listed below are located within the electronic device described in Attachment A.

## STATUTORY AUTHORITY

4.      This investigation concerns alleged violations relating to material involving the sexual exploitation of minors. More specifically violations of  18 U.S.C. § 2251A(a) and (b) (production of child pornography); 18 U.S.C. § 2252A(a)(2) (distribution/receipt of child pornography); 18 U.S.C. § 2252A(a)(3)(B) (distributes or solicits child pornography); 18 U.S.C. § 2252A(a)(1) (transportation of child pornography); 2252A(a)(5)(B) (possession of child pornography):

2

a.  18 U.S.C. § 2251(a) prohibits persuading, inducing, enticing or coercing any minor to engage in, or who has a minor assist any other person to engage in, or who transports any minor in or affecting interstate commerce with the intent that such minor engage in, any sexually explicit conduct for the purpose of producing child pornography.

b.  18 U.S.C. § 2251(b) prohibits any parent, legal guardian, or other person with rights of custody or control over a minor who sells or otherwise transfers control of such minor with knowledge that the minor will be used to depict sexually explicit conduct or with the intent of promoting the minor in sexually explicit conduct.

c.  18 U.S.C. § 2252A(a)(2) prohibits knowingly receiving or distributing any child pornography that has been mailed or shipped or transported in interstate or foreign commerce by any means, including by computer.

d.  18 U.S.C. § 2252A(a)(3)(B) prohibits promoting, presenting, distributing, or soliciting any material or purported material in a manner that reflects the belief, or that is intended to cause another to believe that the material or purported material is or contains obscene visual depictions of a minor engaging in sexually explicit conduct or visual depictions of an actual minor engaging in sexually explicit conduct.

e.  18 U.S.C. § 2252A(a)(1) prohibits knowingly transporting child pornography using any means or facility of interstate or foreign commerce or in or affecting interstate or foreign commerce by any means including by computer or mail.

f.  18 U.S.C. § 2252A(a)(5)(B) prohibits knowingly possessing, or accessing with intent to view, any book, magazine, periodical, film, videotape, computer disk, or any other material that contains an image of child pornography that has been mailed, or shipped or transported using any means or facility of interstate or foreign commerce or in or affecting interstate or foreign commerce by any means, including by computer, or that was produced using materials that have been mailed, or shipped or transported in or affecting interstate or foreign commerce by any means, including by computer.

**DEFINITIONS**

5.   The following definitions apply to this Affidavit and Attachment B:

g.  "Child erotica," as used herein, means materials or items that are sexually arousing to persons having a sexual interest in minors but that are not necessarily obscene or do not necessarily depict minors engaging in sexually explicit conduct.

h.  "Child pornography," as defined in 18 U.S.C. § 2256(8), is any visual depiction, including any photograph, film, video, picture, or computer or computer-generated image or picture, whether made or produced by electronic, mechanical, or other means, of sexually explicit conduct, where (a) the production of the visual depiction

3

involved the use of a minor engaged in sexually explicit conduct; (b) the visual depiction is a digital image, computer image, or computer-generated image that is, or is indistinguishable from, that of a minor engaged in sexually explicit conduct; or (c) the visual depiction has been created, adapted, or modified to appear that an identifiable minor is engaged in sexually explicit conduct.

i.  "Cloud storage," as used herein, is a form of digital data storage in which the digital data is stored on remote servers hosted by a third party (as opposed to, for example, on a user's computer or other local storage device) and is made available to users over a network, typically the Internet.

j.  "Computer," as used herein, refers to "an electronic, magnetic, optical, electrochemical, or other high speed data processing device performing logical or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device" and includes smartphones, other mobile phones, and other mobile devices. *See* 18 U.S.C. § 1030(e)(1).

k.  "Computer hardware," as used herein, consists of all equipment that can receive, capture, collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, or similar computer impulses or data. Computer hardware includes any data-processing devices (including central processing units; internal and peripheral storage devices such as fixed disks; external hard drives; "thumb," "jump," or "flash" drives, which are small devices that are plugged into a port on the computer; and other memory storage devices); peripheral input/output devices (including keyboards, printers, video display monitors, and related communications devices such as cables and connections); as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (including physical keys and locks).

l.  "Computer passwords and data security devices," as used herein, consist of information or items designed to restrict access to or hide computer software, documentation, or data. Data security devices may consist of hardware, software, or other programming code. A password (a string of alpha-numeric characters) usually operates what might be termed a digital key to "unlock" particular data security devices. Data security hardware may include encryption devices, chips, and circuit boards. Data security software may include programming code that creates "test" keys or "hot" keys, which perform certain pre-set security functions when touched. Data security software or code may also encrypt, compress, hide, or "booby-trap" protected data to make it inaccessible or unusable, as well as reverse the process to restore it.

m.  "Hyperlink," as used herein, refers to an item on a web page or in a mobile application which, when selected, transfers the user directly to another location in a hypertext document or to some other web page or (part of) a mobile application.

4

n. "Internet Service Providers" ("ISPs"), as used herein, are commercial organizations that are in business to provide individuals and businesses access to the Internet. ISPs provide a range of functions for their customers including access to the Internet, web hosting, email, remote storage, and co-location of computers and other communications equipment.

o. An "Internet Protocol address" or "IP address," as used herein, refers to a unique numeric or alphanumeric string used by a computer or other digital device to access the Internet. Every computer or device accessing the Internet must be assigned an IP address so that Internet traffic sent from and directed to that computer or device may be directed properly from its source to its destination. ISPs typically maintain logs of the subscribers to whom IP addresses are assigned on particular dates and times.

p. The "Internet" is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

q. "Minor," as defined in 18 U.S.C. § 2256(1), refers to any person under the age of eighteen years.

r. "Records," "documents," and "materials," as used herein, include all information recorded in any form, visual or aural, and by any means, whether in handmade, photographic, mechanical, electrical, electronic, or magnetic form.

s. "Sexually explicit conduct," as defined in 18 U.S.C. § 2256(2), means actual or simulated (a) sexual intercourse, including genital-genital, oral-genital, anal-genital, or oral-anal, whether between persons of the same or opposite sex; (b) bestiality; (c) masturbation; (d) sadistic or masochistic abuse; or (e) lascivious exhibition of the anus, genitals, or pubic area of any person.

t. A "storage medium" is any physical object upon which computer data can be recorded. Examples include hard disks; RAM; "thumb," "jump," or "flash" drives; CD/DVDs; and other magnetic or optical media.

u. "URL" is an abbreviation for Uniform Resource Locator and is another name for a web address. URLs are made of letters, numbers, and other symbols in a standard form. People use them on computers by clicking a pre-prepared link or typing or copying and pasting one into a web browser to make the computer fetch and show some specific resource (usually a web page) from another computer (web server) on the Internet.

v. "Visual depiction," as defined in 18 U.S.C. § 2256(5), includes undeveloped film and videotape, data stored on computer disc or other electronic means which is capable of conversion into a visual image, and data which is capable of conversion into a visual image that has been transmitted by any means, whether or not stored in a permanent format.

**BACKGROUND OF THE INVESTIGATION AND PROBABLE CAUSE**

6.      On 01/23/2024, law enforcement was contacted by the Winfield High School Principal, regarding an incident that occurred at Newton High School (NHS) during the Tournament of Champions (TOC) wrestling tournament held between 01/10/2024 and 01/13/2024. The principal told law enforcement that three minor children reported they were in the locker room taking a shower when an adult male coach from Salina Central, identified as RYAN BRUNGARDT (BRUNGARDT), entered the locker room. The minor children reported that they suspected BRUNGARDT was filming them while they were naked and showering.

7.      Law Enforcement contacted the NHS Athletic Director who had also been notified of the situation by the Winfield HS Athletic Director. The NHS Athletic Director told law enforcement he had located video footage of BRUNGARDT entering the boy's locker room 5 times in a 45 minute period. The NHS Athletic Director told law enforcement one of the times BRUNGARDT exited the locker room, he saw him looking at his cell phone. The NHS Athletic Director stated that struck him as odd, especially based on what was reported to him by the Winfield Athletic Director. The NHS Athletic Director also said he noticed BRUNGARDT would remain in the boy's locker room for approximately 2 minutes before exiting.

8.      The NHS Athletic Director said he also saw Brungardt enter the girl's locker room and exit after approximately 30 seconds. The NHS Athletic Director explained the boys would utilize the girl's locker room as well to change and shower since there were not females wrestling on those days. The NHS Athletic Director said he was pretty sure there was no one in the girl's locker room at the time Brungardt entered. The NHS Athletic Director told law enforcement he had preserved a section of surveillance video.

6

9.      Law enforcement interviewed some of the minor victims. Each victim stated that BRUNGARDT would hold his phone in an odd manner while ostensibly using the urinal. BRUNGARDT also kept the camera pointing at the minor victims with his phone under his arm or in his back pocket. The minor victims also reported that BRUNGARDT paced around the locker room and appeared to be looking at them and filming them. The minor victims found this odd and concerning. In talking with other minors present at the event, they found that BRUNGARDT was acting in this manner with others. As such, the minors reported it to their coach.

10.     On 01/26/2024, law enforcement reviewed the saved camera footage from NHS, recorded on January 13th, 2024, and observed BRUNGARDT enter the locker room 7 times between 3pm and 4pm.

11.     Law enforcement could see BRUNGARDT holding a cell phone in some of the videos. Law enforcement described the phone to appear to be a black, or dark in color cell phone. Law enforcement also observed Brungardt to be wearing what looked like a smart watch with a round face and white band.

12.     On 01/29/2024, law enforcement went to BRUNGARDT's place of employment, Lakewood Middle School, in Salina KS to seize a black/dark color cell phone and smart watch observed on the videos from BRUNGARDT. While law enforcement was interviewing BRUNGARDT, he forcibly took the cell phone from law enforcement officers and began breaking it. Law enforcement attempted to gain control of BRUNGARDT and get the phone back from him. BRUNGARDT continued to resist. BRUNGARDT was in the process of breaking his cell phone, potentially to dispose of evidence. During the altercation, the lithium-Ion battery inside of the phone was punctured and started a fire in the office, resulting in the evacuation of the middle school. BRUNGARDT was successfully placed into restraints and escorted out of the school.

7

13.     The broken cellular phone was seized and a state warrant was obtained. The phone was transferred to the Kansas Bureau of Investigation for potential forensic extraction. Upon initial review of the device, it was determined to send the device to the Heart of America Regional Computer Forensic Lab in Kansas City (HARCFL) for attempted extraction. Having been broken in half the device was significantly damaged. The device was delivered to HARCFL on February 9, 2024.

14.     On 02/26/2026, law enforcement was provided the completed cell phone extraction. On 02/27/2026 law enforcement began to review the extracted data. During that review, several videos were noted and appeared to show minor children under the age of 18, fully nude in the locker room showers within NHS. One specific video designated by its MD5 hash value of E9A06298F476E9CA650579438D186CA3, clearly depicted 3 such minor victims.

15.     The minor victims (Minor Victim 1, Minor Victim 2 and Minor Victim 3) were visually identified by law enforcement via team photos from the event, driver's license photos and publicly available social media post. Minor Victim 1, Minor Victim 2 and Minor Victim 3 were observed showering within the NHS locker room. This specific shower area had three pillars with shower heads in a row. The three juveniles were utilizing the center shower pillar while being filmed.

16.     Minor Victim 1 and Minor Victim 2 are clearly seen in a state of full-frontal nudity. Minor Victim 3 is partially obstructed by a set of towels hanging on the first pillar showers; however, you can clearly see Minor Victim 3's face and upper torso. The video is 5 seconds long. The minor victims are shown throughout the near entirety of the video. The video was shown to be wholly consistent with the previous reports from the minor victims.

17.     The locker room was identified as the NHS boy's locker room by local law enforcement.

18.     After starting the review of the extractions and identifying some of the minor victims, investigators ceased review of the extraction in order to obtain this federal search warrant to include crimes related to child pornography. Although 3 minor victims have been identified in one video, there are additional materials from the extraction to review.

19.     Due to the facts presented above, I believe that it is probable that the **TARGET DEVICE**, further described in Attachment A, contains additional contraband and evidence, fruits, and instrumentalities, further described in Attachment B, of violations of 18 U.S.C. § 2251A(a) and (b) (production of child pornography); 18 U.S.C. § 2252A(a)(2) (distribution/receipt of child pornography); 18 U.S.C. § 2252A(a)(3)(B) (distributes or solicits child pornography); 18 U.S.C. § 2252A(a)(1) (transportation of child pornography); 2252A(a)(5)(B) (possession of child pornography); and respectfully request that a search and seizure warrant be issued for the **TARGET DEVICE**.

**BACKGROUND ON CHILD PORNOGRAPHY, COMPUTERS, AND THE INTERNET**

20.     Based on my experience in the investigation of computer-related crimes and the discussions I have had with other investigators who have experience in investigations related to child exploitation, I know the following:

   a.  Computers and digital technology are the primary way in which individuals interested in child pornography interact with each other. Computers basically serve four functions in connection with child pornography: production, communication, distribution, and storage.

   b.  Digital cameras and smartphones with cameras save photographs or videos as a digital file that can be directly transferred to a computer by connecting the camera or smartphone to the computer, using a cable or via wireless connections such as "WiFi" or "Bluetooth." Photos and videos taken on a digital camera or smartphone may be stored on a removable memory card in the camera or smartphone, or

transferred to external storage devices, such as a USBC. These memory cards and USBC devices are often large enough to store thousands of high-resolution photographs or videos.

c.  The computer's ability to store images in digital form makes the computer itself an ideal repository for child pornography. Electronic storage media of various types - to include computer hard drives, external hard drives, CDs, DVDs, and "thumb," "jump," or "flash" drives, which are very small devices that are plugged into a port on the computer - can store thousands of images or videos at very high resolution. It is extremely easy for an individual to take a photo or a video with a digital camera or camera-bearing smartphone, upload that photo or video to a computer, and then copy it (or any other files on the computer) to any one of those media storage devices. Some media storage devices can easily be concealed and carried on an individual's person. Smartphones and/or mobile phones are also often carried on an individual's person.

d.  A modem allows any computer to connect to another computer through the use of telephone, cable, or wireless connection. Mobile devices such as smartphones and tablet computers may also connect to other computers via wireless connections. Electronic contact can be made to literally millions of computers around the world. Child pornography can therefore be easily, inexpensively and anonymously (through electronic communications) produced, distributed, and received by anyone with access to a computer or smartphone.

e.  The Internet affords individuals several different venues for obtaining, viewing, and trading child pornography in a relatively secure and anonymous fashion.

f.  Individuals also use online resources to retrieve and store child pornography. Some online services allow a user to set up an account with a remote computing service that may provide email services and/or electronic storage of computer files in any variety of formats. A user can set up an online storage account (sometimes referred to as "cloud" storage) from any computer or smartphone with access to the Internet. Even in cases where online storage is used, however, evidence of child pornography can be found on the user's computer, smartphone, or external media in most cases.

g.  A growing phenomenon related to smartphones and other mobile computing devices is the use of mobile applications, also referred to as "apps." Apps consist of software downloaded onto mobile devices that enable users to perform a variety of tasks – such as engaging in online chat, sharing digital files, reading a book, or playing a game – on a mobile device. Individuals commonly use such apps to receive, store, distribute, and advertise child pornography, to interact directly with other like-minded offenders or with potential minor victims, and to access cloud-storage services where child pornography may be stored.

10

h. As is the case with most digital technology, communications by way of computer can be saved or stored on the computer used for these purposes. Storing this information can be intentional (*i.e.*, by saving an email as a file on the computer or saving the location of one's favorite websites in, for example, "bookmarked" files) or unintentional. Digital information, such as the traces of the path of an electronic communication, may also be automatically stored in many places (*e.g.*, temporary files or ISP client software, among others). In addition to electronic communications, a computer user's Internet activities generally leave traces or "footprints" in the web cache and history files of the browser used. Such information is often maintained indefinitely until overwritten by other data.

21. Based on my previous investigative experience related to child exploitation investigations, and the training and experience of other law enforcement officers with whom I have had discussions, I know there are certain characteristics common to individuals who produce and access online child sexual abuse and exploitation material:

a. Such individuals may receive sexual gratification, stimulation, and satisfaction from contact with children, or from fantasies they may have viewing children engaged in sexual activity or in sexually suggestive poses, such as in person, in photographs, or other visual media, or from literature describing such activity.

b. Such individuals may collect sexually explicit or suggestive materials in a variety of media, including photographs, magazines, motion pictures, videotapes, books, slides and/or drawings or other visual media. Individuals who have a sexual interest in children or images of children oftentimes use these materials for their own sexual arousal and gratification. Further, they may use these materials to lower the inhibitions of children they are attempting to seduce, to arouse the selected child partner, or to demonstrate the desired sexual acts.

c. Such individuals almost always possess and maintain child pornographic material in the privacy and security of their home or some other secure location. Individuals who have a sexual interest in children or images of children typically retain those materials and child erotica for many years.

d. Likewise, such individuals often maintain their child pornography images in a digital or electronic format in a safe, secure and private environment, such as a computer and surrounding area. These child pornography images are often maintained for several years and are kept close by, usually at the possessor's residence, inside the possessor's vehicle, or, at times, on their person, or in cloud-based online storage, to enable the individual to view the child pornography images, which are valued highly. Some of these individuals also have been found to

11

download, view, and then delete child pornography on their computers or digital devices on a cyclical and repetitive basis.

e. Importantly, evidence of such activity, including deleted child pornography, often can be located on these individuals' computers and digital devices through the use of forensic tools. Indeed, the very nature of electronic storage means that evidence of the crime is often still discoverable for extended periods of time even after the individual "deleted" it.[1]

f. Such individuals also may correspond with and/or meet others to share information and materials, rarely destroy correspondence from other child pornography distributors/possessors, conceal such correspondence as they do their sexually explicit material, and often maintain contact information (e.g. online messaging accounts, email addresses, etc.) of individuals with whom they have been in contact and who share the same interests in child pornography.

g. Such individuals prefer not to be without their child pornography for any prolonged time period. This behavior has been documented by law enforcement officers involved in the investigation of child pornography throughout the world.

h. In my training and experience conducting child exploitation investigations, I am aware that persons who receive, possess, and distribute images of child pornography sometimes utilize email accounts and online "cloud" storage to correspond with other persons sharing similar interests; and that those persons sometimes utilize those email accounts and online "cloud" storage to receive, transmit and store images of child pornography. Cloud-based storage can be utilized by child pornography distributors/possessors to add a layer of anonymity to their actions, as well as attempt to conceal the trading and collecting of child exploitation material from law enforcement.

22. I submit that there is probable cause to believe those records referenced above will be stored on that electronic device or storage medium, for at least the following reasons:

a. Deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's

---

[1] *See United States v. Carroll*, 750 F.3d 700, 706 (7th Cir. 2014) (concluding that 5-year delay was not too long because "staleness inquiry must be grounded in an understanding of both the behavior of child pornography collectors and of modern technology"); *see also United States v. Seiver*, 692 F.3d 774 (7th Cir. 2012) (Posner, J.) (collecting cases, e.g., *United States v. Allen*, 625 F.3d 830, 843 (5th Cir. 2010); *United States v. Richardson*, 607 F.3d 357, 370-71 (4th Cir. 2010); *United States v. Lewis*, 605 F.3d 395, 402 (6th Cir. 2010)).

operating system may also keep a record of deleted data in a "swap" or "recovery" file.

b. Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

c. Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

d. Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

23. As further described in Attachment B, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described in the warrant, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence will be on any storage medium in the item listed in Attachment A because:

a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, email programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

13

b.  Information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, information stored within a computer or storage media (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, Internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer or storage media. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner. Further, computer and storage media activity can indicate how and when the computer or storage media was accessed or used. For example, computers typically contain information that logs: computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected with the computer, and the IP addresses through which the computer accessed networks and the Internet. Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the crime under investigation. Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect.  For example, images stored on a computer may both show a particular location and have geolocation information incorporated into its file data. Such file data typically also contains information indicating when the file or image was created. The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera). The geographic and timeline information described herein may either inculpate or exculpate the computer user. Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation. For example, information within the computer may indicate the owner's motive and intent to commit a crime (e.g., Internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

c.  A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

d.  The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored

14

on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

f. I know that when an individual uses a computer to obtain or access child pornography, the individual's computer will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime. The computer is an instrumentality of the crime because it is used as a means of committing the criminal offense. The computer is also likely to be a storage medium for evidence of crime. From my training and experience, I believe that a computer used to commit a crime of this type may contain: data that is evidence of how the computer was used; data that was sent or received; notes as to how the criminal conduct was achieved; records of Internet discussions about the crime; and other records that indicate the nature of the offense.

24.    Based upon my training and experience, and information relayed to me by agents and others involved in the forensic examination of computers, I know that computer data can be stored on a variety of systems and storage devices, including external and internal hard drives, flash drives, thumb drives, micro SD cards, macro SD cards, DVDs, gaming systems, SIM cards, cellular phones capable of storage, floppy disks, compact disks, magnetic tapes, memory cards, memory chips, and online or offsite storage servers maintained by corporations, including but not limited to "cloud" storage. I know that during searches, it is not always possible to search computer equipment and storage devices for data for a number of reasons, including the following:

a. Searching computer systems is a highly technical process that requires specific expertise and specialized equipment. There are so many types of computer hardware and software in use today that it is impossible to bring to the search site all of the technical manuals and specialized equipment necessary to conduct a thorough search. In addition, it may also be necessary to consult with computer personnel who have specific expertise in the type of computer, software, or operating system that is being searched;

15

b.  Searching computer systems requires the use of precise, scientific procedures, which are designed to maintain the integrity of the evidence and to recover "hidden," erased, compressed, encrypted, or password-protected data. Computer hardware and storage devices may contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. Since computer data is particularly vulnerable to inadvertent or intentional modification or destruction, a controlled environment, such as a law enforcement laboratory, is essential to conducting a complete and accurate analysis of the equipment and storage devices from which the data will be extracted;

c.  The volume of data stored on many computer systems and storage devices will typically be so large that it will be highly impractical to search for data during the execution of the physical search of the premises; and

d.  Computer users can attempt to conceal data within computer equipment and storage devices through a number of methods, including the use of innocuous or misleading filenames and extensions. For example, files with the extension ".jpg" often are image files; however, a user can easily change the extension to ".txt" to conceal the image and make it appear that the file contains text. Computer users can also attempt to conceal data by using encryption, which means that a password or device, such as a "dongle" or "keycard," is necessary to decrypt the data into readable form. In addition, computer users can conceal data within another seemingly unrelated and innocuous file in a process called "steganography." For example, by using steganography a computer user can conceal text in an image file which cannot be viewed when the image file is opened. Therefore, a substantial amount of time is necessary to extract and sort through data that is concealed or encrypted to determine whether it is contraband, evidence, fruits, or instrumentalities of a crime.

25.    Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying storage media that reasonably appear to contain some or all of the evidence described in the warrant and would authorize a later review of the media or information consistent with the warrant. The later review may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

16